In re Two Minor Children.

(*July* 7, 1961.)

(Reargument denied September 13, 1961.)

SOUTHERLAND, Chief Justice, WOLCOTT, Justice, and SEITZ, Chancellor, sitting.

*William Prickett, Jr.* (of Prickett, Prickett and Tybout) for appellant.

*H. Albert Young* and *Bruce M. Stargatt* (of Morford, Young and Conaway) for appellee.

Supreme Court of the State of Delaware, No. 22, 1961.

WOLCOTT, J.:

This is an appeal from a part of a judgment of the Superior Court authorizing limited rights of visitation of an adoptive mother with her adopted children. At the request of counsel, and in view of the fact that the adopted children will grow up in the Community of Wilmington, we have agreed to preserve the anonymity of the parties. This opinion, therefore, will refer to the adoptive father as X; to the adoptive mother as Y, and to the present husband of the adoptive mother as Z.

X and Y were married in Wilmington on September 13, 1948. They lived thereafter in Princeton, New Jersey, while X completed his education. Upon his graduation he obtained a position which took him to Buffalo, New York. After the marriage, it developed that Y was unable to have children and, consequently, X and Y adopted the two minor children involved in this litigation. Their present ages are 7 and 5 respectively.

While X and Y were residing in Buffalo disharmony began to take place in their marital life, and Y began to have affairs with other men. Some time in 1958 Y met Z and immediately formed an amorous attachment for him. Shortly after the meeting, Y and Z entered into an adulterous relationship. Z had been married and divorced four times, dismissed from the United States Air Force, had no job and no immediate prospects of a job.

X knew of the relationship between Y and Z. He tried to save his marriage with Y and, at his insistence, she went to see a psychiatrist. Meantime, X was transferred by his employer to Wilmington. Z also came to Wilmington and continued to see Y, who was largely supporting him. Their adulterous relationship was continued.

All of this culminated on April 13, 1959, on which day Y returned home about 6:00 A.M. after having spent the night in the company of Z. X remonstrated with Y, upon which Y packed her bag and left the marital home. Y thereafter stayed in Wilmington about eight days and returned to the domicile of X only to obtain and pack her clothes and personal belongings. She thereupon left by air for California in the company of Z.

Upon leaving, Y made no arrangements for the care of the two minor children adopted by her and X other than to leave them in the care of a nursemaid. Since that time X has provided for the care and supervision of the two adopted children through a series of nurses, housekeepers, etc.

In California Y and Z lived openly together in a small house. The expenses of supporting them were borne by Y from her inheritance and from money sent her by her mother. Z, while having a minor job for a few months, is otherwise without means of supporting himself and Y. As a matter of fact, at the present time, Y still provides the support for herself and Z, who is now her husband.

In the fall of 1959 an aunt of Y's went to California to see her and to try to persuade her to come back to Wilmington in order to straighten out her marital affairs. Y's aunt was primarily concerned about the abandonment by Y of the two minor children. Y refused to return to Wilmington and failed to show any remorse at leaving X or at abandoning the two minor children.

In the spring of 1960, Y went to Nevada, and obtained an *ex parte* divorce from X, thereupon returning to California and continuing to live openly with Z. In December, 1960, Y and Z drove across the country from California and were married on December 9, 1960 at Towson, Maryland. They then came to Wilmington and rented a home where they now reside. However, they have not been accepted as a part of the

community by Y's former friends who refuse to see her on a social basis.

On December 22, 1960, Y filed a petition in the Family Court of New Castle County seeking custody of the two minor children adopted by her and X. As a result of a hearing before the Family Court on December 31, 1960, the custody of the two minor children was given to X and the case referred to a psychologist. The psychologist examined X, Y and the two minor children, but did not examine Z for any purpose. He reported back to the Family Court. Apparently on the basis of this report, on February 10, 1961, an order was entered continuing custody of the children in X, and allowing Y limited visitation rights.

X appealed from this order to the Superior Court and, on March 14 and 15, 1961, a hearing *de novo* was held by the Superior Court as a result of which an order was entered continuing complete custody of the children in X, and granting Y limited visitation rights. It is from the grant of limited visitation rights that X appeals to this court.

The limited right of visitation prescribed in the order of the Superior Court of April 7, 1961 is that Y should have the right to have the two minor children visit her at her home on alternate Saturdays from 2:00 to 5:00 P.M., out of the presence of Z, and in the presence of a staff member of the Family Court.

It is obvious that the right of visitation granted Y has been strictly circumscribed by the Superior Court but, even so, X objects to the grant of any visitation right at all. His position is that Y, by her abandonment of the children and prior and subsequent adulterous relationship with Z, has worked a forfeiture of her parental right which has not been redeemed by her subsequent marriage to Z. He further contends that Y has demonstrated by her conduct that she morally is an unfit person to have any contact whatsoever with

the minor children, and that any contact with them by her, far from being in the children's best interests, would turn out to be a positive detriment.

Y contends on the other hand that she loves the children, wants to see them, and that they in turn want to see her. It is argued, therefore, that visitation with her would prove to be a benefit to the children. Y further contends that Judges of the Family Court and the Superior Court have weighed the evidence and found this to be the fact, and that, accordingly, on appeal this court must abide by their decisions in this respect.

 In cases of this kind the fundamental rule to be followed by any court in providing for custody and visitation of minor children is to order that which will serve the best interests of the children and provide for them a decent, respectable place in which to be brought up. *In re Maris*, 7 *Penn.* 242, 63 *A.* 197; *Smith v. Smith*, 4 *Terry* 268, 45 *A.* 2d 879; *Ex parte Marti*, 7 *Terry* 313, 314, 83 *A.* 2d 688, and *Moore v. Moore*, 1 *Storey* 592, 150 *A.* 2d 194.

The cited Delaware decisions laying down the rule referred to are cases of applications for the custody of minor children rather than applications to have afforded to a parent the right of visitation. We think, however, there is no fundamental difference, except perhaps as a matter of degree, between the showing a parent must make to have the custody of children awarded him and the showing he must make to be afforded the right of visitation. In both instances, the primary concern of the court is to secure the welfare of the child.

We are not concerned in this appeal with the custody of these minor children since that has been awarded to X by order of the Family Court, which was not appealed by Y. We are concerned solely with the application of Y to have a court order X to permit her the right of visitation.

Generally speaking, a parent denied custody of minor children does not thereby lose his natural right to visit with and be visited by his child. 67 *C. J. S. Parent and Child* § 8; 39 *Am. Jur., Parent and Child,* § 14. All of the authorities we have examined are uniform in stating this as a matter of law. No point has been made of the fact that these children are adopted and, indeed, we think none could be made, for there is no difference in this problem between natural and adoptive children. 1 *Am. Jur., Adoption of Children,* § 52.

However, in exceptional cases the right of a parent to visit with and to be visited by his child may be denied by a court if the best interests of the child demand the deprivation of the parent's natural right. 2 *Nelson on Divorce and Annulment,* 2nd Ed., § 15.26. If the affording of visitation privileges to a guilty parent would injuriously affect the welfare of the child, then a court will interpose its order against the gratification of natural parental affection in the interest of protecting the child. While courts are reluctant to take away this natural inclination of parents, they nevertheless should not hesitate to do so when the affording of the right may possibly injure the child's welfare.

A parent may by his past conduct forfeit the right to visit with his child. Whether or not such a forfeiture has taken place is again related to the protection of the welfare of the child, and if the prior conduct of the applying parent is such as to raise doubt in the mind of the court that visitation between such a parent and the child would be in the best interests of the child, then visitation should be denied until, by the parent's conduct, he has demonstrated beyond doubt that visitation will not injuriously affect the child's welfare. *Jacquet v. Disimone,* 175 *La.* 617, 143 *So.* 710; *Townsend v. Townsend,* 205 *Md.* 591, 109 *A.* 2d 765.

One circumstance repeatedly held to establish a forfeiture of the right to custody of children is the continuance of an adulterous relationship by a guilty parent which

has caused the marriage to disrupt in divorce. The reason is that an immoral atmosphere is presumptively injurious to the child's welfare. This, of course, does not operate as an absolute rule of law since the peculiar circumstances of a particular case may require the placing of custody of the children with the adulterous parent. *Cf. Moore v. Moore, supra.* We think there is little difference, except in degree, between circumstances which work a forfeiture of the right to absolute custody and the forfeiture of a right to visitation. In either case, it is necessary for the errant parent to demonstrate by his conduct a reformation of character indicating that resumption of parental relationship with his child will not adversely affect the welfare of the child. See *Hild v. Hild*, 221 *Md.* 349, 157 *A.* 2d 442, and *Parker v. Parker*, 222 *Md.* 69, 158 *A.* 2d 607. Nor does the subsequent marriage of an adulterous wife to her paramour demonstrate *ipso facto* such reformation of character. See cases collected in an annotation in 43 *A. L. R.* 2d 375. In each case the court must be satisfied that there has taken place in fact a change in character on the part of the adulterous parent, and that the resumption of the parental relationship will not adversely affect the child.

The rules we have referred to, we think, were the reasons the trial judge granted Y only such an extremely circumscribed right to visit with these minor children. He must have had some lingering doubt as to the reformation of Y, and of the desirability of permitting even this slight amount of visitation. This seems apparent from his retention of jurisdiction and direction that a review of the order be made six months later.

■■ We, of course, accept with a great deal of deference the findings of a trial judge who has heard the witnesses, and we will not ordinarily overturn those findings. We have, however, carefully considered this record and are of the opinion that the trial judge was wrong in permitting at this time even this slight amount of visitation. We reach this conclu-

sion not in contradiction of the facts found by him, but by an application of the principle of law that the welfare of the child must be provided for with as little uncertainty as possible.

We think there are certain undisputed facts in this record which require us as a matter of law to hold that this grant of visitation was at least premature.

Initially, let us consider the marriage of Y to Z, her former paramour, which might be regarded as a curing of a former defect of character. Prior to this, Y and Z had lived openly and adulterously together in California for the space of approximately one year. Thereupon, Y divorced X and, thereafter, Y and Z continued to live openly together, without marriage, for approximately eight months. It was only on December 9, 1960, on their joint return to the East, that they finally married. No explanation of the delay is made, but one permissible inference is that the marriage was a planned step in Y's attempt to re-establish herself and be accepted in the Wilmington community.

Thirteen days later, on December 22, 1960, Y filed a petition in the Family Court seeking custody of the children she had abandoned some two years before. The closeness in time between the marriage and the petition, and the failure to marry at the first opportunity might permit the inference that the marriage itself was motivated by Y's desire to re-establish herself in the Community of Wilmington, and to obtain custody of these children as a part of this plan. This is one possible inference, but we do not say it is necessarily correct. It remains to be demonstrated, however, how permanent and how sincere Y and Z are in their present marital relationship. In any event, standing alone, for this short a period of time Y's marriage to Z does not demonstrate such a change of character as would restore to Y the right of visitation she forfeited by her abandonment of the minor children.

Furthermore, the psychologist's report following his examination of X, Y and the two minor children does not justify, we think, risking at this time the welfare of these children. They are at present admittedly well adjusted, normal, intelligent and well-behaved children—thanks to the upbringing they have received at the hands of X. There is, therefore, no immediate change required for their welfare.

The psychologist specifically finds that Y's present stability in large measure is due to the emotional fulfillment of her new marriage, and that the present change the psychologist found in Y from her former emotional instability is due almost solely to that marriage. He further found that her desire to see the children was sincere and that seeing them would gratify for her several needs. These needs are (1) the receiving of affection from the children; (2) her feeling of guilt for having left the children would be lessened, and (3) subconsciously, that having the children would be a recognition by society that her abandonment of them was not entirely her personal fault.

The psychologist also found that Y "is an intense woman who craves affection. When the pressure is extensive and she perceives the surroundings as distressing and rejecting, elements of depression may hinder her performance. Frustration tolerance and self-control now test as adequate. There is a fulfillment from her second marriage that has allowed sufficient psychic energy to be poured into constructive outlets. The test of substantial healthy sublimation of this sort will come with the passage of time."

If we read this finding properly, it may be summed up in more commonplace English by saying that Y formerly was emotionally unsettled, but that her present marriage has apparently given her emotional stability. Only the passage of time, however, will demonstrate whether she has in fact become an emotionally stable person.

We note that there is no finding by the psychologist to the effect that the visiting of the children with Y would be of benefit to the children, although he did state that the children were interested in seeing their mother. We note, however, that the subject was first raised by the psychologist rather than by the children. The whole purport of his recommendation of limited visitation is that seeing the children would benefit Y and help to stabilize and keep permanent her present marriage. This, we think, may be commendable as an effort to benefit Y, but it does not meet the requirement of the law that visitation be granted or denied as the welfare of the children requires. That is the sole criterion for the guidance of the court.

We think therefore that the affording of even limited rights of visitation to Y at this time is premature and, therefore, an error in law. We do not say that Y by her past conduct has forever forfeited the right to visit with these children. If she continues to lead a stable moral life and demonstrates an emotional maturity which would not jeopardize the children's present well-adjusted situation, she may overcome the forfeiture. At the present time, however, we are of the opinion that not sufficient time has elapsed to demonstrate that it would be in the best interest of presently happy children to have their pattern of life suddenly changed by periodic visitations with the mother who abandoned them and whom they have not seen since that abandonment, and to whose absence they have satisfactorily adjusted.

For the foregoing reasons the order of the Superior Court affording Y the right of visiting with the minor children is reversed.

### On Petition for Reargument and for Issuance of Special Mandate

Following the filing of the opinion in this cause, Y petitioned under Rule 13, *Del. C. Ann.*, for reargument and for

the issuance of a special mandate. At our request, X filed a short answer to the petition. The petition seeks reargument of the outright reversal of the portion of the order below appealed from, and requests the issuance of a special mandate preserving the jurisdiction of the Superior Court over the cause with instructions governing the conduct of future proceedings and the time within which they may be commenced. We deny the petition and take this means of stating our reasons briefly.

The basis of Y's request to amend the outright reversal is that unless this is done the Superior Court will be deprived of jurisdiction. If this follows, it is argued, Y must start anew in the Family Court and would thus be subjected to the same "unnecessarily duplicitious hearings" this cause has already followed. The theory underlying the argument, we think, must be that exclusive jurisdiction over questions of custody of minor children has been conferred upon the Family Court. We think, however, this not to be the law.

Exclusive original jurisdiction over petitions relating solely to custody of children is conferred upon the Family Court by 10 *Del. C.* § 951(11) only "when the parents shall live in the state of separation without being divorced." Questions of custody and visitation, however, may arise in the Family Court in the exercise of its other original exclusive jurisdiction as incidental to the exercise of that jurisdiction, as seems to have happened in this cause.

In other factual situations concurrent jurisdiction is granted by 10 *Del. C.* § 952(2) to the Family Court of writs of *habeas corpus* for the purpose of determining the question of custody of minor children. Obviously, therefore, Y could institute future petitions in either the Family Court or, at her option, in the Superior Court which has long exercised jurisdiction over writs of *habeas corpus* to determine questions of custody of minor children.

■ It is then argued that any remand should be with instructions that future hearings shall be confined to circumstances post-dating the original hearings since the past indiscretions of the parties have already been thoroughly explored. We think, however, that we are without power to do as Y requests. It is possible that further evidence of past conduct might come to light which would be pertinent in any future hearing. Furthermore, the trial judge in his discretion, it seems to us, could accept as evidence in a future hearing the transcript of the original hearing and, in his further discretion, could preclude the parties from duplicating the testimony contained in it. The conduct of future hearings, we think, must necessarily be left to the sound discretion of the trial judge.

■ Next, Y urges us to set a future date upon which Y may be permitted to renew her application for visitation rights. This, we think, is impossible for us to do.

■ In the first place, decisions on custody of minor children and of visitation with them are never matters of *res judicata*. They may be reopened at any time by the parties as a matter of right. We think we may not deprive Y of that right by fixing a time limitation.

If the request of Y that we fix a date is an attempt by her to have us lay down as a matter of law that the leading by her of a stable moral life demonstrating an emotional maturity for a definite period of time will *ipso facto* give her the right of visitation, we refuse to do so. As we pointed out, the prime consideration in these matters is the welfare of the children. That is an ultimate fact to be determined by the trial judge from all the circumstances proved before him. We are without authority to take that function from him. In a future hearing Y must satisfy the trial judge that she at that time has reached an emotional maturity so that visitation with

the children would not jeopardize their present well adjusted situation. When that time will come, it is impossible now to say. Its existence will be a matter of fact to be determined in a future hearing.

Finally, Y moves to strike from X's answer to the petition a statement described as impertinent, malicious, irrelevant and a scandalous characterization of her petition for reargument. We think the statement uncalled for and unwarranted but decline to strike it. It falls considerably short of the scandalous.