**ELIZABETH A. S., Respondent Below, Appellant,**

v.

**ANTHONY M. S., Petitioner Below, Appellee.**

Supreme Court of Delaware.

Submitted April 15, 1981.

Decided Aug. 20, 1981.

Robert L. Halbrook and Eugene H. Bayard (argued), of Wilson, Halbrook, Bayard, Bunting & Marshall, Georgetown, for respondent below-appellant.

Robert C. Wolhar, Jr. (argued), of Wolhar & Moore, Georgetown, for petitioner below-appellee.

Before HERRMANN, C. J., DUFFY and QUILLEN, JJ.

HERRMANN, Chief Justice:

This is a mother's appeal from a Superior Court decision affirming a Family Court grant of child-visitation privileges to the father pursuant to 13 *Del.C.* § 727.[1] The issue is whether the Family Court, in determining the extent of visitation privileges, should have considered the effect of the father's continuing and open adulterous relationship with his paramour upon the child's moral character development.

## I.

The pertinent facts in this case are these:

Appellant Elizabeth A.S. ("the mother") and appellee Anthony M.S. ("the father") are the parents of Jennifer M.S., born October 20, 1978. Six months after Jennifer's birth, the father moved out of the marital household and took up residence with his paramour, another married woman. The two presently live together in what the Family Court below termed "an adulterous relationship",[2] and both have filed petitions seeking divorce from their respective spouses.[3] Jennifer has remained in the custody of her mother, although no petition for custody was ever filed; they reside together in the former marital household. Since the time of his departure, the father has voluntarily provided $20 per week for Jennifer's support.

In August, 1979, the father filed in Family Court a Petition for Visitation Rights.

---

**1.** 13 *Del.C.* § 727 provides:

"§ 727. Visitation privileges.

"(a) A parent not granted custody of the child is entitled to reasonable visitation privileges unless the Court finds, after a hearing, that visitation by the parent would endanger the child's physical health or significantly impair his emotional development.

"(b) The Court may modify an order granting or denying visitation privileges whenever modification would serve the best interests of the child."

**2.** At the Family Court hearing, there was very little evidence presented with regard to the adulterous relationship between the father and his paramour. The Court, apparently of the view that an in-depth probing of the relationship was of little relevance to the proceeding, cut short the questioning on the topic, stating, "I think we're wasting a lot of time. The relationship is an adulterous relationship, I so declare it."

**3.** Throughout these proceedings, it has been the mother's position that she wishes her husband to desist from his present conduct, to return to the marital home, and to reunite their family.

Visitation privileges were granted: the father was permitted to have visitation with Jennifer every Thursday (his day off) and every other Sunday afternoon. The Family Court found that his paramour was expected to be present during the Sunday afternoon visitation.

The mother objected to the grant of any visitation in the presence of her husband's paramour. Consequently, she filed in Family Court an Alternative Motion for Reargument or for Further Restrictive Limitations upon Visitation Privileges and for a Stay, which was denied. She then appealed both the denial and the visitation order to the Superior Court. That Court affirmed the visitation order, and the mother brings this appeal. We reverse.

## II.

The mother contends that it is not her intention by this action to totally deprive the father of visitation with Jennifer. Rather, she says, she wants any visitation privileges restricted so that Jennifer will have no contact with her husband's paramour or their dwelling place. The mother asserts that this restriction is desirable to insure that Jennifer will not be exposed to the immoral atmosphere of an adulterous household. The father's position, set forth in greater detail below, is that his adulterous relationship is irrelevant to a granting of visitation under 13 *Del.C.* § 727, and should not be considered by the Court so as to restrict his visitation privileges. Thus our inquiry focuses upon § 727, the Visitation Privileges Statute.

## III.

Section 727 was enacted by the General Assembly in 1974. Prior to that time, legislative action in the area of child custody and visitation was minimal; it was left for the courts to determine standards governing the grant of custody and visitation privileges. Ultimately, there evolved in custody cases the "best interests of the child" rule:

> "In this proceeding, the Court is concerned only with the present and future welfare of the child. This is the paramount and controlling consideration, the rights and wishes of parents and all other considerations being subordinate thereto. Each such case must be viewed in relation to the health, happiness, development and morals of the child. After a careful consideration of the facts, and in the exercise of a sound judicial discretion the Court must place the minor child in such custody as will best serve the future welfare of the child."

*Ex Parte Marti*, Del.Super., 83 A.2d 688, 690 (1951). See also *Moore v. Moore*, Del.Super., 150 A.2d 194 (1959). *Smith v. Smith*, Del.Super., 45 A.2d 879 (1946); *Ex Parte Maris*, Del.Super., 63 A. 197 (1906). The "best interests" standard was later held to govern visitation as well:

> "[T]he fundamental rule to be followed by any court in providing for custody and visitation of minor children is to order that which will serve the best interests of the children and provide for them a decent, respectable place in which to be brought up.
>
> " * * * [T]here is no fundamental difference, except perhaps as a matter of degree, between the showing a parent must make to have the custody of children awarded him and the showing he must make to be afforded the right of visitation. In both instances, the primary concern of the court is to secure the welfare of the child."

*In re Two Minor Children*, Del.Supr., 173 A.2d 876, 878–79 (1961).

Prior to 1974, it was the case law of this State that an immoral atmosphere was presumptively against a child's "best interests"; and a parent involved in a continuing adulterous relationship was presumed to have forfeited his or her rights to custody and visitation. To that effect, this Court stated in *In re Two Minor Children, supra* :

> "One circumstance repeatedly held to establish a forfeiture of the right to custody of children is the continuance of an adulterous relationship by a guilty parent which has caused the marriage to disrupt in divorce. The reason is that an immor-

al atmosphere is presumptively injurious to the child's welfare. This, of course, does not operate as an absolute rule of law since the peculiar circumstances of a particular case may require the placing of custody of the children with the adulterous parent. Cf. *Moore v. Moore*, supra. We think there is little difference, except in degree, between circumstances which work a forfeiture of the right to absolute custody and the forfeiture of a right to visitation. In either case, it is necessary for the errant parent to demonstrate by his conduct a reformation of character indicating that resumption of parental relationship with his child will not adversely affect the welfare of the child. * * * Nor does the subsequent marriage of an adulterous wife to her paramour demonstrate *ipso facto* such reformation of character. See cases collected in an annotation in 43 A.L.R.2d 375. In each case the court must be satisfied that there has taken place in fact a change in character on the part of the adulterous parent, and that the resumption of the parental relationship will not adversely affect the child."

173 A.2d at 879–80.

In 1974, the General Assembly enacted a general revision of the statutory law regarding child custody and visitation, and for the first time set forth statutory standards relating thereto. 59 *Del.Laws*, ch. 569 (1974), codified 13 *Del.C.* ch. 7. As to child custody, the new law codified the "best interests of the child" standard, but removed all sex qualifications or presumptions as to parental fitness for custody. 13 *Del.C.* § 722.[4] More importantly for present purposes, as to visitation, the new-

ly-created § 727 provided that "a parent not granted custody of the child is entitled to reasonable visitation privileges" unless such visitation "would endanger the child's physical health or significantly impair his emotional development" [727(a)]; and that any visitation order might be modified whenever it "would serve the best interests of the child" [727(b)].

## IV.

The mother argues that the presumption created in *In re Two Minor Children*—that uncircumscribed visitation with a parent involved in a continuing adulterous relationship is presumptively not in the best interests of the child—governs the instant situation, § 727 notwithstanding. She asserts that she is entitled to the requested restrictions upon the father's visitation unless he proves that "there has taken place in fact a change in character on the part of the adulterous parent," and that unrestricted visitation "will not adversely affect the child." *In re Two Minor Children*, 173 A.2d at 880. According to the mother, the Family Court below did not adequately address this issue, i. e. the impact upon Jennifer of the father's open and continuing adulterous relationship and current living arrangement with his paramour.

The father argues, on the other hand, that the enactment of § 727 effectively extinguishes the presumption created in *In re Two Minor Children*. He contends that § 727 reverses the presumption, so that the noncustodial parent is presumed to be entitled to visitation privileges and that such privileges may be denied only upon a Court finding that visitation would "endanger the

---

**4.** 13 *Del.C.* § 722 provides:

"§ 722. Best interests of child.

"(a) The Court shall determine custody in accordance with the best interests of the child. In determining the best interests of the child, the Court shall consider all relevant factors including:

"(1) The wishes of the child's parent or parents as to his custody;

"(2) The wishes of the child as to his custodian;

"(3) The interaction and interrelationship of the child with his parent or parents, his

siblings, and any other person who may significantly affect the child's best interests;

"(4) The child's adjustment to his home, school and community; and

"(5) The mental and physical health of all individuals involved.

"(b) The Court shall not presume that a parent, because of his or her sex, is better qualified than the other parent to act as custodian for a child, nor shall it consider conduct of a proposed custodian that does not affect his relationship to the child."

child's physical health or significantly impair his emotional development." By § 727, the father contends, the General Assembly intended to "remove the morality issue" from the Family Court determination of visitation privileges, and thus any adultery on his part is irrelevant thereto. He bolsters his argument by noting that adultery is no longer a criminal offense in this State.

## V.

■ We disagree with the father's contention that the enactment of § 727 evinces a legislative intent to "remove the morality issue" from the Family Court determination of visitation privileges. As part of the judicial search for the best interest of the child as the ultimate issue and judicial concern in custody and visitation cases, the Courts of this State have long been concerned with protecting the moral development of the child. See *In re Two Minor Children, supra; Ex Parte Maris, supra; Moore v. Moore, supra; Ex Parte Marti, supra; Smith v. Smith, supra.* We will not lightly impute to the General Assembly an implied intention to dismantle this time-honored function of the Courts in custody and visitation cases. We find no such intention; indeed, the existing evidence suggests an opposite intention.

In the 1974 legislation, the General Assembly explicitly retained the "best interests of the child" as the basic and fundamental standard in custody and visitation cases. By § 722(a), it provided that "the Court shall consider all relevant factors" (including certain designated ones) in determining the child's "best interests" in custody cases; and by § 727(b), the "best interests of the child" is made the ultimate test for visitation. It is unreasonable to assume that, by implication, the General Assembly intended to emasculate the traditional function of the Courts in seeking to protect the moral development of the child in the search for his or her "best interests."

We are likewise unable to discern a legislative intent to "remove the morality issue" from the fact that, in its 1973 revision of the Criminal Code, the General Assembly abolished adultery as a crime. Possibly, the failure to legislate against adultery reflects the General Assembly's perception that "it [is] inappropriate for the government to attempt to control behavior that has no substantial significance except as to the morality of the actor," Model Penal Code, Tent. Draft No. 4 (1955), Comments to Article 207, Sexual Offenses, p. 207; even if accurate, however, that view would be irrelevant in the instant situation. In the child custody and visitation context, unlike the criminal context, the Courts must consider the adulterous conduct as it affects not the actors but the primary person involved: the child. The moral considerations in the criminal context are thus wholly different from those in the custody-visitation context; any legislative intent with regard to the former does not govern the latter.

■ It is more reasonable to conclude that, in its enactment of § 727, the General Assembly intended to retain the traditional judicial concern with the moral development of the child in visitation cases. The Statute expressly provides that, in a determination of visitation privileges, the Court should consider the effect of visitation upon the child's "emotional development." Any conception of a child's "emotional development" must, we think, embrace the moral upbringing, development and character of that child. Compare *Ex Parte Marti,* 83 A.2d at 690. It follows that, in a determination of visitation privileges under § 727, the Family court should consider the effect of a parent's open and continuing adulterous conduct as it affects the proper development of the child's moral character and, hence, his or her emotional development.

Having concluded that § 727 does not obliterate this traditional judicial concern, however, we agree that the 1974 Statute has wrought a significant change in the law as it theretofore existed. As has been noted, § 727 provides that the noncustodial parent is entitled to reasonable visitation privileges unless the Court finds that such visitation "would endanger the child's physical health or significantly impair his emotional development." This statutory language makes two changes:

First, it reverses the presumption in *In re Two Minor Children* that a parent involved in a continuing adulterous relationship forfeits his or her right to visitation. Section 727 effectively creates a presumption in favor of visitation for any noncustodial parent—even an adulterous one—and the statements in *In re Two Minor Children* indicating otherwise are, by operation of the Statute, no longer the law.

Second, § 727 has shifted the burden of proof from the noncustodial parent to the custodial parent. The burden is no longer upon the adulterous parent seeking visitation to demonstrate that "there has taken place in fact a change in character on the part of the adulterous parent" and that visitation "will not adversely affect the child." Rather, the burden now rests upon the custodial parent to prove that unrestricted visitation "would endanger the child's physical health or significantly impair his emotional development." Thus, in the instant case, the restrictions upon visitation sought by the mother can be granted only if she establishes to the Trial Court's satisfaction that visitation in the father's adulterous household and in the presence of his paramour will so affect the proper development of Jennifer's moral character as to significantly impair her emotional development.

The Family Court, appearing to rely upon such analysis, denied the restrictions sought by the mother in this case. But we are not satisfied that the Family Court properly applied the statutory standards as outlined herein. We note particularly that the Trial Court must permit a sufficient evidentiary inquiry as to the impact upon Jennifer of the father's open and continuing adulterous home situation.

We are aware of the problems inherent in predicting such impact upon a child as young as Jennifer was (about 1 year)[5] when this action was heard by the Trial Court. Nevertheless, there must appear in the record below a sound evidentiary basis for the Court's conclusion. We find this lacking in the instant case.

\* \* \*

To summarize, we hold that: (1) the General Assembly did not intend to "remove the morality issue" from the Family Court's determination of visitation privileges under § 727; (2) in making such a determination, the Family Court should consider whether a parent's open and continuing adulterous conduct affects the child's moral character development so as to "significantly impair [her] emotional development"; (3) the Family Court in the instant case failed to permit a proper evidentiary inquiry in this regard; and (4) such evidentiary inquiry should be made, with the mother carrying the burden of going forward.

Accordingly, we reverse and remand the case for further proceedings consistent herewith.

---

**5.** We note that Jennifer is now almost three years old; the evidence of child psychology may be more readily available for a child of that age (and older as the years go by) than for an infant.