**CAPRI M.P., Petitioner,**

v.

**RONALD O., Respondent.**

Family Court of Delaware,
New Castle County.

Submitted: May 15, 1984.
Decided: June 12, 1984.

Frederick S. Kessler of Agostini & Frabizzio, Wilmington, for petitioner.

Francis J. Trzuskowski of Trzuskowski, Kipp, Kelleher & Pearce, Wilmington, for respondent.

THOMPSON, Chief Judge:

This is the Court's decision on a visitation petition which was filed in 1977 by the mother of four children who have remained in the custody of their father since the parties' divorce in 1974.

Shortly after the divorce petitioner signed an agreement which provided that custody should remain with the children's father, the respondent, and that she would not seek visitation privileges at that time. This provision was agreed to after petitioner consulted a psychiatrist who was treating the children as a result of the emotional turmoil surrounding petitioner's estrangement from the family. While involved in an extramarital relationship, petitioner was in and out of the house for almost two years prior to the divorce. Shortly before the parties' final separation, she spent two months in a private psychiatric hospital for treatment of depression marked by self-destructive tendencies. She subsequently married her paramour, by whom she was pregnant, divorced him, and, after another unsuccessful marriage, now lives in California with her fourth husband and two children born of these marriages.

At the time petitioner left the family, Ronnie was age five, Krissy was four, Cara was two, and Erica was one. Respondent hired daytime housekeepers and sought counseling for the children who were affected to some extent by the petitioner's departure. One individual who has played a prominent role in bringing these children to their current state of emotional equilibrium is respondent's wife, Barbara, who came into the household originally as a governess. The couple have two other children.

Without chronicling in detail the procedural history of this case, the Court finds that the delay in resolving the petition can be attributed to a combination of factors, including the need for numerous psychological and psychiatric evaluations. Because of the passage of time, re-evaluations and updated recommendations were ordered. Petitioner blames part of this delay on her previous attorney, whom she fired and then sued for malpractice. All these maneuverings were done at long distance and at a time when petitioner was going through several marriages and divorces and was raising two other children. Nevertheless,

for at least six years petitioner has persisted in her demand for visitation and respondent in his opposition.

In the course of these proceedings, petitioner has seen three psychologists and two psychiatrists and, needless to say, there is no shortage of expert evidence. In 1977, one psychologist reported that the petitioner had found strength and stability in her third marriage. The facts show that petitioner and her third husband separated six months later and were subsequently divorced. The reports based on the most in-depth analyses come from Dr. Lord Lee-Benner of Los Angeles, California, and Dr. Ellen Gay of Wilmington, Delaware. Dr. Lee-Benner's knowledge of the petitioner dates back before her divorce from respondent in 1974, when he treated her during her stay in a psychiatric hospital. The petitioner, against her wishes and at the insistence of the respondent, was again seen by Dr. Lee-Benner in 1976 for the purpose of showing change, if any, in petitioner's emotional condition. His report was most uncomplimentary and concluded that his original assessment of pathological narcissism remained the same.

In 1982, Dr. Gay evaluated all the parties involved in the case. Her report reflected a general agreement with Dr. Lee-Benner's description of petitioner's personality; however, she recommended a supervised trial visit.

A hearing was held in June 1982 but was continued to receive a written report of the Court-ordered evaluation by Dr. Gay. After the Court received the report, further testimony was ordered from Dr. Gay by way of deposition. Based on Dr. Gay's interviews with the petitioner, the respondent, the children's stepmother, and the four children, the recommended trial visitation took place for approximately two hours, in Dr. Gay's office, in October 1983. After the trial visitation, Dr. Gay did a follow-up evaluation of the children which concluded that the visit went well, the children were not demonstrably affected, and, although not without some reservations, she found the children would probably not be harmed if another structured visitation took place.

In the meantime, the judge who had been hearing the case retired. On May 3, 1984, this judge held a final hearing, giving the parties, including the stepmother, the opportunity to summarize their positions. The children were interviewed individually and as a group.

Petitioner contends that she has never given up her quest to maintain contact with her children and that she has a right to visitation but is willing to abide by any reasonable plan in order to avoid disrupting the children's lives. Throughout the years she has sent cards and money gifts to the children on holidays and birthdays but has not contacted them directly, in part because respondent has denied such contact and, further, because she was awaiting the Court's disposition. She has submitted a detailed proposal for visitation through the summer of 1986 which amounts to four visits with her children each year. She claims she does not wish to harm the children or interfere in their lives but steadfastly maintains her right to build a relationship with her children so that they may know her and know her love for them.

Respondent and his wife oppose visitation of any sort. Respondent described the period when petitioner was moving in and out of the house and her instability in the years prior to the divorce. Respondent sees petitioner as manipulative and self-interested to the point that he fears she will use the children to prove her self-worth and then move on when her goal has been achieved or when the relationship no longer satisfies her. Respondent and his wife described their struggle to build a stable family life, the developmental problems of each child, and the long healing process which was required in the aftermath of petitioner's "desertion" of the children. The children's stepmother, Barbara, described Ronnie's past problems with lying, insecurity, and fear of failure; Krissy's early acting out; Cara's deafness, which was later diag-

nosed as psychosomatic; and Erica's present fairy-godmother view of her natural mother. In a particularly heartfelt plea, she warned that the four ebullient teenagers seen by the Court are in a precarious stage of life and still suffer from unseen wounds. Both respondent and his wife resent petitioner's intrusion and see her as a danger to the hard-fought stability the family is now enjoying. They feel that her presence is not needed and that visitation will provide no benefit to the children, only sure harm. Respondent terms the Court's involvement an invasion of privacy and asks this Court for guarantees that his children will not be hurt by contact with their mother. Respondent declined the Court's request for a counter-proposal to petitioner's visitation schedule.

From the Court's interviews with the children, the Court sees four seemingly normal and well-adjusted teenagers who are sports-minded and family-oriented and have no outstanding school problems. The Court was impressed by their family "togetherness." Their life revolves around traditional family holidays, visits with grandparents, and a regular Christmas trip to the Cayman Islands. The children are protective of these activities. All seem to love and respect their father and to agree that their stepmother has been a good mother. Only the eldest remembers his natural mother and then only as to her physical characteristics.

Ronald is age 17 and graduates from high school this June. He plays baseball and plans to attend college, either in Florida or at the University of Delaware. Before the trial visitation, he was excited about seeing his mother, and although he has not thought much about her since, he feels he wants to see her again. He also states that the Court's decision will not affect him much, since he will soon be 18 (in November) and can make his own decision. When questioned as to a particular time for visitation, only then did problems surface as to the practicalities of coordinating visitation with his job schedule, school plans, and family trips.

Kristen is 16. She works hard in school and is active in sports. After some difficulty expressing herself, it was clear that she is apprehensive that further visitation would interfere with her own activities and the family's and would "change everything." She sees her mother as a "stranger" and is not sure she can trust her. Kristen thinks of her stepmother as her mother.

Cara is 14, likes acting and is also sports-oriented. She voiced the same concerns as her sister, and, further, stated that she does not think she should have to visit with her mother, since her mother left them and she only has four more years until she is 18, when she can make her own decision.

Erica is 13 and she also leads and active school and sports life. Her feelings toward visitation are more positive than her sisters'. She was curious about her mother, liked meeting her, and would not mind seeing her again. She did speculate that petitioner may hurt them again by leaving.

Whatever the children's individual feelings were concerning further visitation, when each was questioned as to the possibility of visitation on certain dates, there was always some activity which seemed to take precedence. It was clear that the children, even those most receptive to further visitation, wanted no interference with the traditional times of family togetherness.

The Court also sensed that, although these children are aware of their father's and stepmother's strong opposition to any visitation with petitioner, she has not been a constant topic of conversation nor has there been a concerted effort to downgrade her. None seemed to know the details of their parents' stormy relationship. Erica said she had heard some good things about her mother. At the same time, all seemed to realize that their father and stepmother would be disappointed if they insisted on seeing the petitioner, and all were aware

that they intended to oppose visitation in any event.

\* \* \*

■■■ There is a generally recognized right of visitation of a noncustodial parent.

The right of visitation is an important, natural and legal right, although it is not an absolute right, but is one which must yield to the good of the child. A parent's right of access to his or her child will ordinarily be decreed unless the parent had forfeited the privilege by his conduct or unless the exercise of the privilege would injuriously affect the welfare of the child, for it is only in exceptional cases that this right should be denied. 2 Nelson, *Divorce*, § 15.26 (2d ed. 1961).

Our neighboring jurisdictions seem particularly solicitous of the parent's right even while invoking the welfare of the child. A Maryland court commented that it found no case decided either by its own court or by the Court of Appeals where visitation had been denied. *Roberts v. Roberts*, Md.Ct.Spec.App., 35 Md.App. 497, 371 A.2d 689 (1977). In *Marciano v. Marciano*, N.Y., 56 A.D.2d 735, 392 N.Y.S.2d 747 (1977), the severance of the father's relationship with his child was too drastic a remedy even in the face of "realistic fears." Visitation has been granted to an openly homosexual parent. *In re J.S. v. C.*, N.J.Super., 129 N.J.Super. 486, 324 A.2d 90 (1974). In *Barron v. Barron*, N.J.Super. Ct.Ch.Div., 184 N.J.Super. 297, 445 A.2d 1182 (1982), a father was granted visitation privileges even though he did not support nor attempt to see the children for five years, and, further, he acknowledged that the children did not wish to see him and were fearful of resuming contact.

While our adoption laws permit the termination of parental rights where there has been intentional abandonment or substantial neglect by such parent, ... no case in New Jersey has ever terminated visitation rights simply because a parent has abandoned or neglected a child. Indeed, "[a]bsent serious wrongdoing or unfitness, the right of visitation is strong and compelling." (Citation omitted.)

*Id.* at 1183. The Maryland Court of Appeals, in *Shapiro v. Shapiro*, 54 Md.App. 477, 458 A.2d 1257 (1983) reversed a lower court which based its denial of visitation on a psychotherapist's recommendation and on the child's negative feelings toward his father. Finding an abuse of discretion, the court stated that only in "extremely exceptional circumstances" should all access be denied. The underlying assumption of these cases seems to be that the good of the child is served by maintaining the relationship between parent and child, e.g., *In re Duckworth*, Pa.Super.Ct., 188 Pa.Super. 232, 146 A.2d 365 (1958), and that aside from the parent's right, the child has a right and privilege to get to know, love and respect both parents, *Fiore v. Fiore*, N.J. Super.Ct.App.Div., 49 N.J.Super. 219, 139 A.2d 414, 419 (1978). Another consideration must be that a total restriction of visitation rights amounts to a de facto termination of parental rights.

In our own jurisdiction, "visitation privileges" have been governed by statute since 1974. The standards for determining an initial petition for visitation and a modification of a prior order are found at 13 *Del.C.* § 727(a) and (b), respectively.

(a) A parent not granted custody of the child is entitled to reasonable visitation privileges unless the Court finds, after a hearing, that visitation by the parent would endanger the child's physical health or significantly impair his emotional development.

(b) The Court may modify an order granting or denying visitation privileges whenever modification would serve the best interests of the child.

In construing § 727(a), the court, in *Elizabeth A. S. v. Anthony M. S.*, Del.Supr., 435 A.2d 721 (1981), stated that the statute brought about a significant change in the law in two respects. First, § 727 creates a presumption in favor of visitation for any noncustodial parent; and second, § 727 shifts the burden of proof from the noncus-

todial parent to the custodial parent to prove that unrestricted visitation "would endanger the child's physical health or significantly impair his emotional development."

In applying the law to the instant facts, there is no indication that petitioner's visitation would endanger the children's physical health. While petitioner's psychological health has been called into question, there is no evidence that she suffers from a serious, incapacitating psychiatric condition which would result in significant impairment of the children's emotional development. Based on Dr. Gay's assessment of the trial visitation, the children's age and stage of emotional development, the strong family support system, and what seems to be the children's cautious and realistic view of the potential problems of a relationship with their mother, I do not find that visitation would significantly impair their emotional development.

If § 727(a) were the only applicable standard, then visitation would be granted. Both parties, however, have cited cases on visitation which make special mention of the best interests of a child as if there were additional considerations beyond a finding that visitation would not endanger the child's physical health or significantly impair the child's emotional development. For instance, in *Lucy K. H. v. Carl W. H.*, Del.Fam. 415 A.2d 510 (1979), in what is described by respondent as dicta, the court states that visitation is but one factor in determining the child's best interests. The question before the Court was the father's duty to pay support for a child who was living in a foreign country. The statement was made in relation to the custodian's right to determine the child's place of residence, even if a move to a distant place inhibited the previously agreed upon visitation arrangement. *Lucy K.H.* is not a case determining initial visitation privileges and therefore is distinguishable.

Reference is made to *In re Two Minor Children*, Del.Supr., 231 A.2d 475 (1967), a case which is somewhat analogous to the

case *sub judice.* The court summarized the law thus:

[I]t is elementary, and agreed by all concerned, that the best interest of the children is the primary consideration in this case. The rights and welfare of the parents are secondary. (Citations omitted.) But, though secondary, the parent of a minor child does have natural rights of visitation which must be recognized unless such rights would be contrary to the child's best interests.

*Id.* at 476, 477. The court's ultimate finding, however, was confined to the question of whether or not visitation would be harmful to the children. "[W]e cannot say that it is clear that visitation by Y at this time would be harmful to the children." *Id.* at 477. The court affirmed the petitioner's right to visitation but modified the lower court's order, concluding that it was not in the best interests of the children to permit visitation to the extent provided by the order. This case was decided prior to 1974, before the shift of the burden of proof to the custodian and before the best interests factors were set out in § 722(a).

Respondent cites a most recent case, *Ruggles v. Riggs*, Del.Supr., 477 A.2d 697 (1984), which reversed two lower courts' decisions granting visitation, for the proposition that "the issue turns on the paramount questions of the child's best interests and welfare." The issues and facts in *Ruggles* are inapposite to those of the case *sub judice.* The *Ruggles* court dealt with a petition from a putative father for prison visitation rights against the opposition of the children's mother and her husband, who had acknowledged the paternity of the children. The court distinguished the rights of a parent and a putative father. Even as to the putative father, the court did not finally determine that visitation was not in the best interests of the children, but rather mandated a new hearing (if the father wished to renew his request) in order for the lower court to supplement the record, which was insufficient regarding

the emotional impact of such visitation on the children.

Both parties find support in *Elizabeth A. S. v. Anthony M. S.*, Del.Supr., 435 A.2d 721 (1981). In construing § 727, the court found that the General Assembly "explicitly retained the 'best interests of the child' as the basic and fundamental standard in custody and visitation cases," citing §§ 722(a) and 727(b) for the proposition that the "best interests" of the child is made the ultimate test for visitation. Section 722(a) specifically applies to custody petitions. Section 727(b) specifically applies to modification of a visitation order. Nevertheless, the conclusion rested on the following narrow issue: "[T]he restrictions upon visitation sought by the mother can be granted only if she establishes to the Trial Court's satisfaction that visitation ... will so affect the proper development of Jennifer's moral character as to significantly impair her emotional development."

The question arises whether the easy references to the "best interests" of a child in the above visitation cases require the trial court to decide an initial visitation petition by using both § 727(a) and the relevant best interests factors including those listed in § 722(a). While § 722(a) specifically applies to custody petitions, these standards are the only legislative guide this Court has in determining the best interests.

If our inquiry were limited to § 727(a), the answer, as previously stated, is that respondent has not met his burden of showing that visitation would endanger the child's physical health or significantly impair the children's emotional development. If the best interests references require the Court to consider all relevant factors including those listed at § 722(a) in addition to § 727(a), then the answer is not so easily revealed. If visitation were purely or ultimately a question of the best interests, then by applying all relevant factors including those listed in § 722(a), we could find

under these facts that the scales would tip against visitation. If the § 722(a) custody factors were applied to the facts, the findings would be as follows:

(1) *The wishes of the child's parent or parents.* The father and stepmother adamantly oppose visitation. The standing of a stepparent to oppose visitation was recognized in *Ruggles v. Riggs, supra.* The mother has been steadfast in her desire for visitation.

(2) *The wishes of the child.* Two of the four children do not wish to visit with their mother, and all of the children wish to avoid visitation which would interfere with their individual or family plans.

(3) *The interraction and interrelationship of the child with his parent or parents, his siblings and any other person who may significantly affect the child's best interests.* There has been no interraction or interrelationship to speak of between the mother and these children other than a recent trial visitation and petitioner's letters and gifts to the children. One of the children described her as a "stranger." On the other hand, there is a strong bond between the members of respondent's family. One daughter specifically mentioned her concern that visitation may affect the children's relationship with their two stepbrothers. The entire family, even those two children who desire further visitation, feel strongly about any dislocation of these relationships.

(4) *The child's adjustment to his home, school and community.* The children seem well-adjusted to their home, school, and community. Visitation would require readjustments and possibly a realignment of loyalties.

(5) *The mental and physical health of all individuals involved.* There is no question of the father's and stepmother's sound physical and mental health. The children's earlier emotional problems seem to be resolved. These problems have been

laid at the feet of the petitioning mother. The mother's own emotional stability has been a major point of contention throughout these proceedings. In addition, other factors which weigh against visitation are the long period of no contact between mother and children and the relative closeness to the age of majority, when the children can make their own decision.

Nevertheless, it is the Court's opinion that these negative factors do not amount to evidence of endangerment of the children's physical health or a significant impairment of the children's emotional development, pursuant to § 727(a).

Rather than relying on a general, amorphous best interests principle, this Court has analyzed the facts in relation to the only legislative standards available to guide its discretion, namely, §§ 722(a) and 727(a), and in so doing, has reached an impasse. It is not difficult to imagine a number of factual patterns where this same conflict would result. Does it necessarily follow from a finding that visitation will not endanger a child's physical health or significantly impair a child's emotional development that visitation will, in fact, serve the child's best interests?

■ Returning to the statute for guidance, the Court notes that § 727(a) makes no mention of the best interests standard. Section 727(b), the provision dealing with modification of visitation orders, does mention the best interests test. Thus, the Court concludes that on an initial visitation petition, the determination is whether visitation will endanger the child's physical health or significantly impair the child's emotional development. The best interests standard is to be applied after the right to visitation has been initially decided in order to determine the extent and conditions of visitation. If the best interests of a child dictate severely limited visitation, then so be it. See *In re Two Minor Children, supra.* This conclusion does not alter the best interests application to a modification of a prior order.

The Court's conclusion not only adheres to the clear language of § 729(a) but is also not inconsistent with the previously cited Delaware authority. In those cases, while the principle of the child's best interests was invoked, there was no specific application of the § 722(a) factors. And, in each case, the final analysis was in terms of the potential harm visitation could cause to a child. Furthermore, this conclusion in no way suggests that the best interests or welfare of a child involved in an initial petition for visitation is not a consideration, but rather that the legislature has predetermined that the exercise of visitation rights is presumptively in the child's best interests absent evidence of significant potential harm to the child. And, of course, all relevant best interests factors including those listed in § 722(a) are subsumed in a determination of whether a child's emotional development will be impaired. But these factors are not to be applied as a separate and competing standard against the specific legislative mandate of § 727(a).

In this case, the Court concludes that although the petitioner should not be denied all access to her children, it is in the children's best interests that her privilege of visitation should be limited and structured to ease reacquaintance with her children and to avoid any undue disruption in respondent's family life.

One more point bears mention. Respondent asks for guarantees that no harm will come to his children. Recognizing and in a way sharing the frustration and apprehension revealed by respondent's rhetorical request, this Court can only answer that it has no guarantees to give—no more than there were guarantees on the day respondent and petitioner married or on the birth of each of these children that their lives would be happy and harmonious and would change only for the better. What is certain is that a decision must be made under the law, and it must be made between

battlelines not of the Court's own choosing. What the Court does know is that the respondent and his wife have done a commendable job in providing love and security for these children against some earlier difficult odds. There is no reason to believe that a relationship between these children and their natural mother at this stage will erase years of love and security or destroy the children's natural inclination toward the source of this love and security. These children seem well-prepared to cope with the situation. Based on petitioner's long struggle to establish her right of visitation, the Court can only conclude that she, too, would not wish to undermine her own children's prospects for a productive and satisfactory future.