IN THE SUPREME COURT OF THE STATE OF DELAWARE

BRYCE K. WILCOX,                          §
                                          §
        Petitioner Below,                 §        No. 11, 2021
        Appellant,                        §
                                          §        Court Below:   Family Court
        v.                                §        of the State of Delaware
                                          §
MARISSA LACLAIRE,[1]                      §        File No. CN13-06261
                                          §        Petition No. 20-05447
        Respondent Below,                 §
        Appellee.                         §
                                          §

Submitted:  August 11, 2021
Decided:  October 18, 2021

Before **VALIHURA**, **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices.

Upon appeal from the Family Court.  **REVERSED**.

Timothy J. Snyder, Esquire, Curtis J. Crowther, Esquire, Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware for Appellant.

Curtis P. Bounds, Esquire, Kara M. Swasey, Esquire, Megan McGovern, Esquire, Bayard, P.A., Wilmington, Delaware for Appellee.

---

[1] The Court previously assigned pseudonyms to the parties under Supr. Ct. R. 7(d).

**VALIHURA, J.**

This is an appeal from an order of the Family Court denying a Petition for Parental Visitation filed by Bryce Wilcox ("Father") on February 23, 2020.[2]  Father has been imprisoned since his son ("C.R.") was two.  C.R.'s mother, Marissa LaClaire ("Mother") does not permit telephone contact between Father and C.R., and has withheld all letters Father has sent C.R.  In denying Father's Visitation Petition, the Family Court declined to order any change in this status quo, and ordered Mother to keep letters Father sends to C.R. should C.R. ever desire to read them.  The Family Court justified the rejection of his petition based on the lack of relationship between Father and C.R. and Mother's testimony that Father's contact with C.R. would impair C.R.'s emotional development.  Appellant raises two arguments on appeal.

First, Father contends that the Family Court erred when it denied Father's request for contact with his son by telephone and mail because there was insufficient evidence that such contact would significantly impair C.R.'s emotional development.  He argues that there is no evidence to support Mother's opinion that future contact between Father and C.R. would cause any harm to C.R.'s emotional development.  Second, Father contends that the Family Court erred when it justified that denial based upon a lack of relationship between Father and C.R. when that lack of relationship was a result of Mother and the Family Court not permitting Father to have contact with his son since August 2015.

---

[2] App. to Opening Br. at A113–119 (hereinafter "A____") (Hearing Order).

Father's arguments have merit. Delaware law provides for children and non-custodial parents to enjoy reasonable access to one another by telephone or mail, so long as that contact would not endanger a child's physical health or significantly impair his or her emotional development.[3] Mother does not argue that Father's requested contact by telephone and mail would place C.R. in any physical danger, and the only support in the record for impairment to C.R.'s emotional development is Mother's speculative lay opinion. Further, the Family Court's decision overlooks our prior opinion involving these same parties wherein we addressed Mother's successful effort to block contact with Father. As a result, the Family Court's decision lacks substantial evidence in the record to support it, is not the product of an orderly and logical process and is **REVERSED**.

## I.     Relevant Facts and Procedural Background

Appellant/Petitioner-Below Father and Appellee/Respondent-Below Mother are the biological and legal parents of C.R., a son born on September 17, 2011. The parties previously appeared before this Court when we reversed an order granting Mother's motion to terminate Father's parental rights.[4] We recounted much of the factual history in that earlier decision.

---

[3] 13 *Del. C.* §§ 727(a).

[4] *See generally Whitmore v. Robinson*, 223 A.3d 417 (Del. 2019). The captions differ since in both cases the Court assigned pseudonyms in accordance with Supr. Ct. R. 7(d). This Court can take judicial notice of matters involving the same parties. *See Johnson v. State*, 55 A.3d 839, 2012 WL 5177792, at *1 n.4 (Del. Oct. 18, 2012) ("[t]he Court takes judicial notice of Johnson's unrelated criminal matter"); 29 Am. Jur.2d Evidence § 145 ("[a]n appellate court may take judicial notice of its own records in the same proceeding, and of its records between the same parties involving the same subject matter"). At the hearing giving rise to the present appeal, the Family Court took judicial notice of "all of the orders that have been entered previously." A26 (Hearing Transcript dated November 30, 2020). *See also* D.R.E. 202(d)(1)(C) ("The court may, without

3

Mother and Father resided together with C.R. for the first four months of C.R.'s life, first at the maternal grandmother's home and then at the paternal grandmother's home until January 2012. Mother and C.R. then moved back in with the maternal grandmother, and Father moved to an unknown location. Four months later, in May 2012, Father moved back in with the paternal grandmother. From May 2012 until July 2013, Father had regular contact with C.R. In August 2013, Mother and Father moved into an apartment together with C.R.

Around September 17, 2013 (C.R.'s second birthday), Mother found evidence of Father's drug use and moved out. By May 2014, Father was active in his drug addiction and had lost his job and housing. Father saw C.R. approximately ten times between September 2013 and August 19, 2014 when he was arrested and incarcerated for Robbery First Degree. For six to eight weeks thereafter he had no contact at all with C.R. From late September or early October 2014 until August 27, 2015, he had, at most, two phone calls per week with C.R. He will remain incarcerated until February 2028 — through C.R.'s sixteenth birthday.[5]

In September 2015, when Father told Mother he faced up to twenty years in prison, Mother stopped all contact between Father and C.R.[6] In December 2015, Father filed a petition for visitation and refiled it on February 9, 2016 to correct a procedural irregularity.

---

request by a party, take judicial notice of the records of the court in which the action is pending and of any other court of this State or federal court sitting in or for this State.").

[5] App. to Ans. Br. at B5 (hereinafter "B__"). Father is not seeking to have C.R. brought to the correctional institution, and, thus, 13 *Del. C.* § 728(d) is not implicated.

[6] *Whitmore*, 223 A.3d at 420.

4

On December 19, 2016, following an unsuccessful mediation, an interim visitation order granted Father twice-weekly telephone and once-weekly mail contact, with the letters to be read to C.R. by Mother or Father's parents ("Grandparents").[7]

Following that interim order, Mother filed an Emergency Motion to Modify Contact on January 3, 2017[8] seeking an emergency *ex parte* order to stop the contact ordered by the interim order until after a hearing on the merits. The basis for her motion was an accusation that Father was affiliated with a prison gang. The accusation was based on social media postings.[9] The Family Court granted the Motion on January 4, 2017, *ex parte*, without any opportunity for Father to respond.[10]

Since September 2015, Mother had conditioned Grandparents' continued visitation with C.R. on them not speaking to C.R. about Father.[11] Grandparents filed their own petition for visitation in July 2016, which was consolidated with Father's December 2015 petition. At the April 20, 2017 consolidated hearing, the Family Court found no evidence supporting Mother's accusation that the pictures which had motivated the *ex parte* order suspending Father's interim visitation showed "a gang sign."[12] Nevertheless, the Family Court denied Father's petition on April 25, 2017. In its decision, the Family Court ordered

---

[7] A123 (Interim Visitation Order). Grandparents are Father's mother and stepfather. A141 (Paternal Grandparents' Visitation Order).

[8] A126 (Emergency Motion to Modify Contact).

[9] *Whitmore*, 223 A.3d at 420. Another averment was that C.R. had developed a close relationship with Mother's fiancé S.L. *Id.*

[10] A125 (Order Granting Emergency Motion to Stay Visitation).

[11] *Whitmore*, 223 A.3d at 421.

[12] *Id.* at 420.

5

that Father not have any contact with C.R., including by telephone and mail.[13]  Specifically,

the Family Court ordered that Father "not write or call [C.R.] until [C.R.] is eight-years old

and has been told by Mother about Father and his circumstances."[14]  As we have previously

described it, "[e]ffectively, in other words, the father was ordered to have no contact with

[C.R.]."[15]  In an order entered the same day, Grandparents' visitation with C.R. was

conditioned on them agreeing "[a]t no time prior to [C.R.]'s eighth birthday shall

Grandparents discuss with [C.R.] or in his hearing range, his biological Father or where he

is, unless prior approval is granted by Mother in writing."[16]  Thus, since January 4, 2017,

Father was prohibited from having any contact with C.R. by Family Court Order, and as

of April 25, 2017, the paternal grandparents were not permitted to mention Father in C.R.'s

presence.[17]

---

[13] A135–A140 (April 25, 2017 Order).

[14] *Whitmore*, 223 A.3d at 420–21.

[15] *Id.* In our decision in *Whitmore*, we noted that, in the termination of parental rights proceedings, Mother contradicted her testimony she provided in the prior visitation proceedings about whether she had spoken to a counselor.  We stated:

> In its decision denying the father's petition for visitation, it appears that the court also relied, in part, upon testimony from the mother that she had spoken to a counselor who advised her that C.R. was too young to be told about his father.  At the TPR hearing the mother appeared to contradict herself by testifying that she had not consulted with any mental health professionals about C.R. being told about his father.  The Family Court order denying father's petition for visitation was not appealed.

223 A.3d at 421, n.12.

[16] A141 (Paternal Grandparents' Visitation Order).  In response to a petition for visitation filed by Father on December 11, 2017, the Family Court amended the order to provide that, "Mother shall send to Father, yearly on May 1, a letter noting [C.R.'s] physical health, education status, and general well-being." *Whitmore*, 223 A.3d at 421.

[17]  A118 (*Hearing Order*, at 6).  Mother contends that Father consented to the restrictions on Grandparents.  But Father contends that he essentially had no choice since Mother was objecting

On June 15, 2017, Mother filed a Petition to Terminate Father's Parental Rights. The Family Court granted the petition on June 27, 2018, concluding that Mother had met her burden of establishing that Father had failed to plan for the child under 13 *Del. C.* § 1103(a)(5) and that it was in the best interest of the child to terminate Father's parental rights.[18] Father appealed that decision to this Court. This Court, in an *en banc* decision, reversed and remanded the case to the Family Court in a decision dated December 3, 2019. We instructed the Family Court not to assign fault to Father for certain periods when he was prevented from having contact with C.R. We specifically instructed the Family Court that

> [i]n determining whether the father has failed or is unable to plan, the court may not consider the lack of contact between the father and C.R. after August 2015. After that month, the mother engaged in persistent efforts to prevent any contact between the father and C.R., either directly or indirectly through the paternal grandparents. The Family Court itself effectively prevented any contact between the father and C.R. when it stayed its visitation order on January 4, 2017. Since April 2017, any attempt by the father to contact C.R. would have violated a Family Court order. Under these circumstances, no fault can be assigned to the father for his lack of contact with the child since September 2015.[19]

---

to Grandparents' Visitation Petition. He states that he "did not want his parents' contact with their grandchild to be terminated by Mother and the Family Court like his had been," and that "Father [and Paternal Grandparents] had no choice but to agree or risk the Paternal Grandparents having no further contact with C.R." Reply Br. at 3, n.3.

[18] 13 *Del. C.* § 1103(a)(5) (statutory grounds for terminating parental rights based on the parent's failure to "to plan adequately for the child's physical needs or mental and emotional health and development" when also accompanied by other circumstances). In October 2017, Mother and S.L. were married.

[19] *Whitmore*, 223 A.3d at 424 (emphasis added).

Ultimately, Mother did not pursue the matter of terminating Father's parental rights.[20] After C.R. turned eight years old and Mother still did not permit Father to contact C.R., Father filed a *pro se* Petition for Parental Visitation on February 23, 2020, seeking to establish contact with C.R. only by letters, phone and cards and not by in-person visitation.[21] In addition, Father filed a Petition—Rule to Show Cause on June 14, 2020, as a result of Mother's failure to permit Father to have contact with C.R. after he turned eight years old. He also complained that Mother had failed to send letters she was required to send updating him on C.R.'s life.[22]

The Family Court conducted a hearing on November 30, 2020. Three witnesses testified: Mother, S.L. ("Stepfather"), and Father (who responded to questions posed by the Family Court). No other witnesses were called to testify at the hearing — no professional therapists, counselors, or other mental health professionals.[23] Mother claimed to have spoken with "counselors," but acknowledged that she had not engaged counseling services for C.R.

The Family Court issued its Order Denying Visitation on December 10, 2020. The Family Court noted that Mother testified that C.R. is thriving and doing well in school, and

---

[20] A114 (*Hearing Order*, at 2) Mother later moved to dismiss her petition to terminate Father's parental rights that the Family Court granted on June 2, 2020. *Id*.

[21] A3 (Petition for Parental Visitation). The Family Court noted that, "Father averred he is not asking for visitation with [C.R.], but is asking the Court to slowly reinstate his rights as a father as he wants to talk to his son." A117 (*Hearing Order*, at 5). *See also id*. ("Father testified he is not seeking visitation with [C.R.] at the prison, but is requesting contact via phone and mail.").

[22] A116 (*Hearing Order*, at 4).

[23] A10 (Transcript of July 13, 2020 Pretrial Conference) ("I anticipated there would be some type of therapist, but it sounds like there is not, at least not yet").

that Stepfather testified that C.R. is a happy and normal nine-year old. Mother testified that she did not think it was in C.R.'s best interests to have contact with Father. When Mother and Stepfather told C.R. that Father was in prison, C.R. wanted to go ride his bike. Mother and Stepfather did not tell C.R. why Father was in prison.[24] The Family Court concluded that "the evidence reflects Mother knows what [C.R.] needs as evidenced by his happiness, health and success in school," and it found that "forcing contact with Father or counseling on [C.R.] would significantly impair his emotional development."[25]

In addition to Mother's testimony regarding what she thought C.R. needed, the Family Court also grounded its denial of Father's petition on Father's lack of a relationship with C.R. The Decision Denying Contact contains the following reasons for denying Father's request to have contact with C.R.:

- Mother should not have to pay for a counselor "to force [C.R.] to engage in telephone and written correspondence with someone he has no recollection of and will not meet for another eight years."[26]

- "Father has playing [*sic*] virtually no role in [C.R.'s] life and can offer nothing to [C.R.] for the next eight years, except a weekly telephone conversation and a pen pal."[27]

- "If [C.R.] had a bond or memory of Father and desired this contact, it could be meaningful, but [C.R.] does not."[28]

---

[24] A81-82 (Stepfather's Hearing Testimony).

[25] A119 (*Hearing Order*, at 7).

[26] A118 (*Hearing Order*, at 6).

[27] *Id.*

[28] *Id.*

- "Although an Order prohibits [Grandparents'] discussion of Father with [C.R.], there is no evidence [C.R.] is asking them about Father."[29]

- "Although the Court understands Father's desire to develop a relationship with [C.R.], the Court will not force the relationship Father offers on a child. [C.R.] is aware he has a biological father in jail. He can ask questions of Mother and Stepfather when interested in knowing more about his father."[30]

The Family Court permitted Father to write letters to C.R., but Mother is not required to show the letters to C.R. and Mother has not given C.R. the letters Father had already written to him.[31] It is not clear from the record whether C.R. knows that the letters exist.

The Family Court denied Father's Rule to Show Cause as to Mother's failure to send C.R.'s annual update letters to Father. Reasoning that Mother had testified that she mailed several letters and that they may have all been lost in the prison mail system, the Family Court determined that Father had failed to show by clear and convincing evidence that Mother was in contempt of the order.[32]

Father filed an appeal of the Order Denying Visitation to this Court on January 8, 2021. He contends that the Family Court erred because there is nothing in the record that would support the conclusion that his requested contact by telephone and mail would

---

[29] *Id.*

[30] *Id.*

[31] A118–119 (*Hearing Order*, at 6–7). On cross-examination, Mother acknowledged that she had received Father's letters to C.R. but that she did not think it was in C.R.'s best interest to read the letters to him. She also testified that she did not believe counseling was appropriate for C.R. A116.

[32] A122 (*Hearing Order*, at 10). Mother testified that she sent the letters by regular mail, rather than certified mail, while Father represented that he would have had to sign for letters had they been delivered. A68–70 (Mother's Testimony).

significantly impair C.R.'s emotional development. He also contends that the Family Court erred by relying upon his lack of contact as justification to deny visitation because his lack of contact was caused, in part, by Mother and the Family Court.

Mother responds that the Family Court properly concluded that "forced" contact between a Father the child does not know supports a limitation on visitation and that contact between Father and C.R. would significantly impair C.R.'s emotional development.

## II.     Standard of Review

"[O]ur scope of review extends to a review of the facts and law as well as to a review of the inferences and deductions made by the [Family Court]."[33] We have the duty to review the sufficiency of the evidence and to test the propriety of the findings.[34] We will not disturb the court's findings of fact unless they are clearly erroneous. In our review of the inferences and deductions made by the court, we "will draw our own inferences and deductions only if we find they are not supported by the record and are not the product of an orderly and logical deductive process, in the exercise of judicial restraint, even though independently we might have reached different conclusions."[35] We review a decision involving a rule of law *de novo*.[36]

---

[33] *Wife (J. F. V.) v. Husband (O. W. V., Jr.)*, 402 A.2d 1202, 1204 (Del. 1979).

[34] *Id.*

[35] *Id.* (citations omitted).

[36] *Mann v. Green*, 49 A.3d 1193, 2012 WL 29448198, at *1 (Del. July 19, 2012) (TABLE).

### III. Analysis

#### A. The Relevant Statutory Framework for Visitation

We start with the basic propositions that: (i) "[p]arental rights arise from a natural relationship and are fundamental liberties which the law has traditionally recognized[,]" and (ii) "[t]hose rights may not be abrogated in the absence of the most compelling reasons."[37] In Delaware, "[t]here is a generally recognized right of visitation of a non-custodial parent."[38] Further, "[b]eing in prison, without more, does not preclude the exercise of visitation by a natural parent[.]"[39] "A parent's right of visitation is 'an important, natural and legal right; however, [visitation] is not an absolute right but one which must yield to the good of the child.'"[40]

---

[37] *In re Stevens*, 652 A.2d 18, 24 (Del. 1995) (citations omitted).

[38] *Capri M.P. v. Ronald O.*, 480 A.2d 669, 673 (Del. Fam. Ct. 1984).

[39] *State ex rel. Taylor M.F.*, 1994 WL 811731, at *1 (Del. Fam. Ct. Feb. 15, 1994). In our prior decision involving these parties, we noted that in the termination of parental rights context, we approved a finding in another Family Court case that "although a person is incarcerated, such a person has means available to both contact the child and assist the child in satisfying her needs either directly to a limited extent but certainly indirectly through friends and relatives." *Whitmore*, 223 A.3d at 423 n. 22 (citing *In re Jones*, 528 A.2d 1113, 1988 WL 5749, at *2 (Del. Jan. 18, 1988) (TABLE)). We observed further that, "[i]ncarceration alone is not a basis for finding that a parent has failed or is unable to plan or that termination of parental rights is in the child's best interests." *Id.* (citing *Matter of Adoption of L.A.S.*, 631 A.2d 928, 936 (N.J. 1993)). Mother agrees and states in her Answering Brief that, "Mother agrees that incarceration alone, without more, does not preclude the Family Court from ordering visitation." Ans. Br. at 13.

[40] *Roberts v. Roberts*, 217 A.3d 1095, 2019 WL 2205901, at *1 (Del. May 21, 2019) (TABLE) (quoting *Winter v. Charles*, 608 A.2d 731, 1992 WL 53404, at *1 (Del. Feb. 3, 1992) (TABLE)). In *Winter v. Charles*, this Court found no abuse of discretion when the Family Court denied respondent's petition to modify a visitation order regarding respondent's two-year old child where the order denied visitation at a correctional facility since such visitation "was not in the child's best interest and welfare, given respondent's lengthy term of incarceration." *Id.*

In Sections 727 and 728 of Delaware's Domestic Relations Code,[41] the General Assembly has signaled its intent to protect visitation rights in situations where there is no risk of either danger to a child's physical health or impairment to the child's emotional development. Both sections emphasize the importance of permitting and enabling contact between a child and both parents, irrespective of their custodial or residential status.

Section 727, entitled "Custody," establishes a parent's right of contact and reasonable access by telephone and mail. Section 727(a) states, in pertinent part, that "each parent and child has a right to reasonable access to the other by telephone or mail."[42] Section 727(a) provides further that, "[t]he Court shall not restrict the rights of a child or a parent under this subsection unless it finds, after a hearing, that the exercise of such rights would endanger a child's physical health or significantly impair his or her emotional development."[43] Under Section 727, the custodial parent has the burden to prove that the contact with the non-custodial parent would endanger the child's physical health or

---

[41] 13 *Del. C.* §§ 727, 728.

[42] 13 *Del. C.* § 727(a) (emphasis added). Section 727(a) states, in full:

> Whether the parents have joint legal custody or 1 parent has sole legal custody of a child, each parent has the right to receive, on request, from the other parent, whenever practicable in advance, all material information concerning the child's progress in school, medical treatment, significant developments in the child's life, and school activities and conferences, special religious events and other activities in which parents may wish to participate and each parent and child has a right to reasonable access to the other by telephone or mail. The Court shall not restrict the rights of a child or a parent under this subsection unless it finds, after a hearing, that the exercise of such rights would endanger a child's physical health or significantly impair his or her emotional development.

[43] 13 *Del. C.* § 727(a).

significantly impair the child's emotional development.[44]

Section 728 addresses visitation rights.[45] Under Section 728(a), "the Family Court determines visitation 'consistent with the child's best interests and maturity,[46] which is designed to permit and encourage the child to have frequent and meaningful contact with both parents unless the Court finds, after a hearing, that contact of the child with one parent would endanger the child's physical health or significantly impair his or her emotional development.'"[47] For purposes of determining a child's best interests, the Family Court

[44] *See Elizabeth A. S. v. Anthony M. S.*, 435 A.2d 721, 726 (Del. 1981). Modification of prior orders is governed by 13 *Del. C.* § 729. Section 729(a) provides that, "[a]n order concerning visitation may be modified at any time if the best interests of the child would be served thereby in accordance with the standard set forth in § 728(a) of this title." 13 *Del. C.* § 729(a).

[45] 13 *Del. C.* § 728(a) (emphasis added). Section 728(a) states in full:

> The Court shall determine, whether the parents have joint legal custody of the child or 1 of them has sole legal custody of the child, with which parent the child shall primarily reside and a schedule of visitation with the other parent, consistent with the child's best interests and maturity, which is designed to permit and encourage the child to have frequent and meaningful contact with both parents unless the Court finds, after a hearing, that contact of the child with 1 parent would endanger the child's physical health or significantly impair his or her emotional development. The Court shall specifically state in any order denying or restricting a parent's access to a child the facts and conclusions in support of such a denial or restriction.

[46] *See, e.g., Mann v. Green*, 49 A.3d 1193, 2012 WL 29448198, at *2 (Del. 2012) (stating that "[u]nder 13 *Del. C.* § 728(a), Family Court judges must determine 'a schedule of visitation with the other parent, consistent with the child's best interests.'"); *Rogers v. Trent*, 594 A.2d 32, 33 (Del. 1991) (citing to 13 *Del. C.* §§ 722, 728); *Winter v. Charles*, 608 A.2d 731, 1992 WL 65404, at *1 (Del. 1992) (stating that, "'[i]n evaluating a petition for visitation, a court must base its determination upon the best interest of the child'") (citing *Rogers v. Trent*, 594 A.2d 32, 33 (Del. 1991) and 13 *Del. C.* §§ 722, 728); *Id.* (stating further that, "[i]ndeed, 'the best interest of the child' is . . . the *ultimate* test for visitation") (emphasis in original) (quoting *Elizabeth A.S. v. Anthony M.S.*, 435 A.2d 721, 725 (Del. 1981)).

[47] *Whitewood v. Henderson*, 222 A.3d 1044, 2019 WL 6130476, at *2 (Del. Nov. 18, 2019) (TABLE) (quoting 11 *Del. C.* § 728(a)).

looks to the factors enumerated in 13 *Del. C.* 722(a).[48]  Special consideration must be given

by the Family Court before ordering visitation within a correctional facility.[49]

---

[48] Section 722(a) provides as follows:

> (a) The Court shall determine the legal custody and residential arrangements for a child in accordance with the best interests of the child.  In determining the best interests of the child, the Court shall consider all relevant factors including:
>
> > (1) The wishes of the child's parent or parents as to his or her custody and residential arrangements;
> >
> > (2) The wishes of the child as to his or her custodian or custodian(s) and residential arrangements;
> >
> > (3) The interaction and interrelationship of the child with his or her parents, grandparents, siblings, persons cohabiting in the relationship of husband and wife with a parent of the child, any other residents of the household or persons who may significantly affect the child's best interests;
> >
> > (4) The child's adjustment to his or her home, school and community;
> >
> > (5) The mental and physical health of all individuals involved;
> >
> > (6) Past and present compliance by both parents with their rights and responsibilities to their child under §  701 of this title;
> >
> > (7) Evidence of domestic violence as provided for in Chapter 7A of this title; and
> >
> > (8) The criminal history of any party or any other resident of the household including whether the criminal history contains pleas of guilty or no contest or a conviction of a criminal offense.

13 *Del. C.* § 722(a).

[49] The General Assembly has addressed the types of crimes (not involved here) committed by an incarcerated parent in relation to whether that parent should be precluded from contact or visitation in a correctional facility.  Under 13 *Del. C.* § 728(e), "[t]he Court shall not enter an order requiring visitation in a correctional facility if the person incarcerated is a sex offender unless the requirements of subchapter II of Chapter 7A of this title are met."   13 *Del. C.* § 728(e). Additionally, under 13 *Del. C.* § 728(f), "[t]he Court shall not enter an order requiring visitation in a correctional facility if the person incarcerated has been adjudicated of committing murder in the first or second degrees."  13 *Del. C.* § 728(f). *See Redacted v Redacted*, 2016 WL 1364299, at *14 (Del. Fam. Ct. Mar. 29, 2016) ("Furthermore, if [m]other is convicted of First Degree Murder, she will be barred from having any visitation with [c]hildren under 13 Del. C. § 728(f).").  The Family Court also distinguishes between incarceration for charges unrelated to child endangerment as opposed to incarceration from charges related to endangering the child.  *Compare S.J.W. v. V.E.L.*, 2012 WL 5198363, at *3 (Del. Fam. Aug. 6, 2012) (finding that it was in the best interests of the child to have some contact with her mother in order to maintain some form of parent-child

*B. The Record Does Not Support the Family Court's Decision Denying Father's Petition for Certain Contact*

In this case, Father has not asked the Family Court to allow in-person visitation where he is presently incarcerated. Instead, he has requested that some contact begin and that he be permitted to have telephone calls with C.R. and to send letters and cards to him. He contends that over his objection, "since August 2015, all of these types of contact had been the subject of interferences by Mother, or prohibited by Family Court order."[50] In denying Father's present request, the Family Court found that "forcing contact with Father or counseling on [C.R.] would significantly impair his emotional development."[51] It stated that

> [a]lthough the Court understands Father's desire to develop a relationship with [C.R.], the Court will not force the relationship Father offers on a child. [C.R.] is aware he has a biological father in jail. He can asks [sic] questions of Mother and Stepfather when interested in knowing more about his father. Father may continue to write letters to [C.R.] and the Court shall order Mother to save the letters should [C.R.] desire to read them. However, as there is no prospect of imminent release from incarceration for Father and

___

relationship since the mother was incarcerated for reasons unrelated to child endangerment), *with Re A.Q.B. v. T.K.B.B.*, 2016 WL 7158561, at *10 (Del. Fam. Aug. 29, 2016) (finding that it is in the children's best interests to have no contact with an incarcerated father in light of the father's convictions involving unlawful sexual intercourse and unlawful sexual contact of his five and six year old nieces in 1991, fourth degree rape conviction against his step-daughter in 2011, and unlawful sexual contact in 2014.); *see also Scott v. Kraft*, 124 A.3d 584, 2015 WL 5451697 (Del. 2015) (TABLE) (affirming Family Court's denial of petition by incarcerated father for in person visitation); *C.H.L. v. D.B.L.*, 2006 WL 4552844 (Del. Fam. Ct. Oct. 25, 2006) (ordering, on an interim basis, in-person visitation with incarcerated mother for one child who wished to see mother but not for the other child who did not, and requiring father to arrange for counseling to assist the children in restoring their relationship with their mother since children had not seen mother for over six years). But importantly here, Father is not seeking in-person visits and thus he correctly observes that his Petition does not implicate the provisions of 13 *Del. C.* § 728(d) pertaining to visits in a correctional facility.

[50] Opening Br. at 14-15.

[51] A118–119 (*Hearing Order*, at 7).

[C.R.] has expressed no desire to know Father, the Court finds no reason to justify forcing [C.R.] to have contact with Father. Father has no basis to argue [C.R.] suffers from anxiety and needs counseling as he does not know [C.R.]. Instead, the evidence reflects Mother knows what [C.R.] needs as evidenced by his happiness, health and success in school.[52]

As set forth above, under Section 727(a), in order to restrict or deny Father's requested telephone and mail contact, the Family Court must find, based upon the evidentiary record, that Mother has demonstrated that Father's requested contact would significantly impair C.R.'s emotional development.[53] In this case, we are not satisfied that the record supports the Family Court's conclusion that the requested contact would significantly impair C.R.'s emotional development. The Family Court's analysis was based almost exclusively upon the Mother's testimony — the gist of which was that C.R. is happy and thriving and that, in her view, allowing contact with Father would not be in C.R.'s best interests.

Mother testified that she spoke with a counselor, but that C.R. has never received counseling services.[54] When asked if she had any concerns for C.R.'s well-being if Father were again allowed to have contact with C.R., she answered, in full:

> Yeah, I do. I feel like right now [C.R.] has a happy, normal childhood. He's thriving in school. And he -- this isn't in the best interest for [C.R.]. [C.R.] knows about him. He hasn't shown any desire to get to know him. He hasn't -- he hasn't said anything.
>
> And what -- what would be best for [C.R.] is since [Father] wasn't in his life prior to him being incarcerated, they never developed a positive relationship,

---

[52] *Id.* (alterations added).

[53] 13 *Del. C.* § 727 (a). Mother has not argued that Father's requested contact would endanger C.R.'s physical health.

[54] A38-39 (Mother's Hearing Testimony).

and they can't develop a positive relationship from prison. It's not a good way to start a relationship.

I've learned from doing a lot of research that you can't develop a relationship through letters with someone you don't know. He doesn't know him and writing a letter -- him receiving a letter from someone he doesn't know from prison is just not a good way to start a relationship. [Father] should have his life together, have a job, show that he – you know, he needs to earn [C.R.'s] trust and just from prison he can't do that. He has to have his life together and prove to [C.R.]. It's not fair to him. He didn't ask for any of this.[55]

A lay witness has the capacity to give opinion testimony only insofar as it is "rationally based on the witness's perception,"[56] among other requirements. An expert witness is not limited to his or her own personal knowledge[57] and "may base an opinion on facts or data in the case that the expert has been made aware of or personally observed."[58] We recognize that attempts to foster a relationship under the circumstances of imprisonment can, depending on the circumstances, have a deleterious effect on a child's psychological and emotional well-being. But here, some expert testimony would have been helpful to identify how contact with his Father would affect C.R. and specifically, whether the limited contact requested would likely significantly impair C.R.'s emotional development.[59]

---

[55] A47–48.

[56] Delaware Uniform Rules of Evidence ("D.R.E.") 701(a).

[57] *See* D.R.E. 602 ("This rule does not apply to a witness's expert testimony under Rule 703.").

[58] D.R.E. 703.

[59] *See, e.g., S.J.W.*, 2012 WL 5198363 at *2 (weighing the factors under 13 *Del. C.* § 722(a) and noting that father was worried daughter would be upset by seeing her mother in jail but noting that father "did not provide expert testimony regarding this claim," and concluding that "[t]he Court concedes a child could become upset when visiting a parent in prison but cannot agree, in the absence of an expert opinion, that doing so will cause irreparable or significant emotional harm."). Further, we wonder what the effect on C.R.'s emotional development might be as he grows older and learns that his Father did attempt to have contact with him, but that such contact was

Mother had the burden of establishing such significant impairment to C.R.'s emotional development.[60] We understand that Mother and S.L. are now married, that their family unit is functioning well and that they do not wish for it to be disrupted. But Mother presented no evidence that contact with Father would cause significant harm to C.R.'s emotional development. Nor is there any evidence that C.R. refuses to have contact with Father or would object to such contact.[61] Rather, Mother focused on C.R.'s normal development and happy, well-adjusted existence. Based upon the record before us, we find that it does not adequately support the Family Court's determination denying Father the limited contact he now seeks.

### C. The Family Court Overlooked this Court's Prior Instruction

Our second concern with the court's decision is that it rests, in part, on Father's lack of contact — a factor that we previously said should not be held against him. The Family Court took judicial notice of the previous hearings and Court orders pertaining to these parties — including this Court's decision reversing the Family Court's grant of Mother's Petition to Terminate Father's Parental Rights. In that decision, this Court observed that Mother had engaged in persistent efforts to prevent any contact between Father and C.R. We also observed that the Family Court itself effectively prevented any contact between

---

persistently blocked by Mother and by certain Family Court orders sought by Mother. How that knowledge might affect him and his relationships with his family is yet another reason why an objective third party professional expert input would have been useful.

[60] *See Elizabeth A.S.*, 435 A.2d at 726.

[61] It appears from the record that C.R. was not interviewed for purpose of these proceedings. In the custody portion of the Hearing Order, the Family Court states that it "did not interview [C.R] and does not know his wishes." A120 (*Hearing Order*, at 8). We note that C.R. is now ten.

Father and C.R. when it stayed its visitation order on January 4, 2017 (since any attempt by Father to contact C.R. would have violated a Family Court order). We directed that: "[u]nder these circumstances, no fault can be assigned to [Father] for his lack of contact with [C.R.] since September 2015."[62] Thus, when we reversed the Family Court's prior decision granting Mother's petition to terminate Father's parental rights, we instructed the Family Court not to give any consideration to the lack of contact between Father and C.R. subsequent to August 2015.[63]

It appears that the Family Court has relied upon the Father's lack of contact with C.R. since September of 2015 in the instant matter. For example, the Family Court emphasized in its decision that C.R. does not have a "bond or memory" of Father,[64] that Father "does not know" C.R.,[65] "does not know [C.R.'s] personality," and has played "no role in [C.R.'s] life and can offer nothing to [C.R.] for the next eight years, except a weekly telephone conversation and a pen pal."[66]

---

[62] *Whitmore*, 223 A.3d at 424.

[63] *Id*.

[64] A118 (*Hearing Order*, at 6).

[65] *Id*.

[66] *Id*. (*Hearing Order*, at 8). These findings stand in contrast to the Family Court's April 2017 factual findings concerning C.R.'s early childhood years:

> [B]ased upon the pictures and the testimony it appears when Father was involved in [C.R.'s] life he was active and they were closely bonded. [C.R.] appears very happy in the pictures with Father and the Court can infer from Mother's initial desire to continue their relationship that Father met his S702 responsibilities and properly cared for [C.R.] prior to becoming fully enmeshed in his addiction.

A139 (April 25, 2017 Custody Order).

Mother contends that our instruction was limited to the prior termination of parental rights proceedings on remand, and that the standards for visitation and termination of parental rights proceedings are different. She asserts that, in these visitation proceedings, the cause of Father's absence is not relevant to the question of whether C.R.'s emotional development would be impaired. We realize that the Father's contact with C.R. by telephone and mail after a sustained period of no contact could affect C.R.'s emotional well-being regardless of the reasons for the absence of contact. But the Family Court's findings, at least to some extent, appear to continue to interject an element of fault on Father's part for the post-2015 lack of contact. We hold that our prior instruction remains relevant to the extent that Father should not be penalized in the proceedings on remand for his lack of contact with C.R. after August 2015. To hold otherwise would be to allow the custodial parent to frustrate the statutory rights of access of the non-custodial parent.[67]

In sum, we remain mindful that Father is responsible for the poor choices that resulted in his lengthy incarceration and physical separation from his son. A parent's imprisonment can have a disruptive and destabilizing effect on a child's life.[68] But as we explained above, Father, even as an incarcerated non-custodial parent, has a right of reasonable access to C.R. by telephone or mail pursuant to Section 727(a), unless Mother

---

[67] We also observe that, in the visitation context and in analyzing the best interests of the child, the Family Court must consider the "[p]ast and present compliance by both parents with their rights and responsibilities to their child under § 701 of this title." 13 *Del. C.* § 722(a)(6).

[68] *See, e.g., Matter of Adoption of L.A.S.*, 631 A.2d 928, 934–35 (N.J. 1993) (observing that, "[v]isitation and contact with an imprisoned parent may generate anxiety and serious emotional upheaval or disturbance," but also noting that in certain cases, "the effects of visitation, communication, and contact with an imprisoned parent are not necessarily harmful and can be beneficial.").

demonstrates that Father's requested contact would significantly impair C.R.'s emotional development or endanger his physical health. And even with our prior instruction aside, Mother has not satisfied her burden where she points to Father's lack of contact that she blocked, bolstered by her own lay testimony that allowing such contact would harm C.R. because C.R. no longer knows him and is presently living a happy, well-adjusted life. More is needed to establish significant impairment to C.R.'s emotional development, especially here where the requested contact is limited. Mother bears the burden of proof, and she has not satisfied it.

Accordingly, for all of the reasons stated herein, we conclude that the record before us does not adequately support the Family Court's decision denying Father's petition. We note that Father seeks contact "by telephone, mail and cards, *without restriction or limitation*."[69] The Family Court should consider what limitations should be put in place, at least on an interim basis, for this limited contact given the absence of a present relationship between Father and C.R.

Based upon the foregoing, we REVERSE the decision of the Family Court and remand for further proceedings consistent with this opinion.

---

[69] Opening Br. at 31 (emphasis added).